**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

**Mark Cosgrove,**

      **Plaintiff**

**v.**                             **Case No.: 23-CV-9562-ALC**

**Columbia Care Inc., and Columbia Care
LLC**

      **Defendants.**

_____/

**SECOND AMENDED COMPLAINT**

Plaintiff, Mark Cosgrove ("Cosgrove"), by and through his undersigned counsel, hereby sues Defendants, Columbia Care Inc. ("Columbia Care") and Columbia Care LLC ("Columbia LLC"), and states as follows:

**INTRODUCTION**

1.      Columbia Care is one of the largest multi-state cannabis companies in the United States. In an effort to expand its market share, Columbia Care enlisted Cosgrove as a partner to facilitate its expansion into the emerging Florida medical marijuana market. Cosgrove performed admirably, locating a partner for Columbia Care with a coveted Florida license and facilitating Columbia Care's investment of more than $25 million into the Florida cannabis industry.

2.      Without Cosgrove's support, Columbia Care would not have been able to access the lucrative Florida markets, which continue to enrich Columbia Care to this day. Despite the essential services rendered by Cosgrove, and repeated promises by Columbia Care that he would be properly compensated and have a key role in its ongoing Florida operations, Columbia Care has shockingly refused to pay Cosgrove anything for his efforts while simultaneously reaping the

benefits of his work. Cosgrove therefore brings this suit to obtain fair compensation for his work on behalf of Columbia Care.

## PARTIES, JURISDICTION, AND VENUE

3.      Cosgrove is an individual and resident of Florida.

4.      Columbia Care is a Delaware corporation with its principal place of business in New York, New York.

5.      Columbia LLC is a Delaware Limited Liability Company with a single member, Columbia Care, with a principal place of business in New York, New York.

6.      This Court has jurisdiction under 28 U.S.C. § 1332 because all parties are of different citizenship and the amount in controversy exceeds $800,000.

7.      Venue is proper in this Court under 28 U.S.C. § 1391 because Columbia Care resides in this district and a substantial part of the events which give rise to this action occurred in this district.

## FACTUAL BACKGROUND

8.      In 2014, the state of Florida passed the Compassionate Use Act, which began Florida's legal medical marijuana program. At the time, Florida announced that five licenses would be issued across the state for integrated cannabis operators. Because of the limited number of licenses, each license was extremely valuable, and the application process was exceedingly competitive.

9.      Cosgrove, at Columbia Care's request, facilitated connections between Columbia Care and local Florida nursery owners (who were essential to the application process) and assisted Columbia Care in pursuing regional licenses in Central Florida and South Florida through those nursery owners.

10.     As part of this process, Columbia Care represented to Cosgrove that he would be a "partner" in a newly-created subsidiary of Columbia Care in Florida ("Florida Sub"). At the time, Nick Vita ("Vita"), Columbia Care's founder and CEO, described Cosgrove as "head of our Florida operation."

11.     Florida Sub was to be a Florida limited liability company. The term sheets exchanged among the parties regarding Florida Sub's formation, though not ultimately executed, were to be governed by Florida law.

12.     Cosgrove was a substantial participant in preparing the medical marijuana license applications for Florida Sub in 2014, targeting licenses to be issued in the Central Florida and South Florida regions. Cosgrove retained and paid for Florida legal counsel to advise on the requirements of these applications.

13.     Cosgrove drafted sections of the applications and worked with Columbia Care's in-house counsel in the preparation of the applications' contents.

14.     Cosgrove solicited, evaluated, and retained various personnel for Florida Sub, including a medical advisor (a required role for the applications), as well as growers and other professionals.

15.     In memoranda prepared in 2014, Cosgrove was repeatedly described as part of the "core management group" for Florida Sub.

16.     Other memoranda and term sheets between the parties identify Cosgrove as a "strategic partner" in the creation of Florida Sub.

17.     As a strategic partner, Cosgrove was to receive an equity ownership interest in Florida Sub, and therefore an ongoing interest in the profits thereof after Columbia Care's acquisition of a license.

18.     As a strategic partner, Cosgrove was also to receive a board seat with management rights where he would participate in the control and operations of Florida Sub after the acquisition of a license.

19.     Though not an exhaustive list, the parties' discussions provided Cosgrove would "provide local expertise, government relations capabilities, and governance participation" with respect to Florida Sub during the application process and after it acquired a medical marijuana license.

20.     To facilitate this, Cosgrove was to be appointed and employed by Florida Sub as the Vice Chairman of the Board.

21.     Cosgrove carried out these duties even before Columbia Care formally gave him a managerial role. For example, Cosgrove retained top Florida state government lobbyists to assist Florida Sub with zoning for dispensary locations.

22.     Cosgrove also personally went out to evaluate dispensary locations and attempt to secure leases for these spaces for Florida Sub in both Central and South Florida.

23.     Florida law required that all owners and managers of a medical marijuana operation in the state were required to pass a Level 2 background screening.

24.     Because Cosgrove was to be an owner and manager of Florida Sub, he was fingerprinted, submitted details of his professional history, and otherwise underwent the background check process.

25.     In 2014, because of the relative novelty of state-legalized medical marijuana, Cosgrove's involvement therein carried substantial risk. Some of Cosgrove's friends and professional colleagues even questioned why he would take this risk.

26.    The most obvious of these risks was that Cosgrove was agreeing to undertake activities with his co-venturers that violated federal laws concerning cannabis.

27.    Cosgrove's involvement with Columbia Care predated later changes to banking regulations, and thus Cosgrove risked being de-banked for his involvement in the marijuana industry. Cosgrove even had two of his personal credit cards terminated by CitiBank as a result of getting into the cannabis business with Columbia Care.

28.    By being listed as a manager and owner on the applications, Cosgrove became responsible for all the statements and contents thereof. Cosgrove took on the risk of participating in a very highly regulated business, subjecting him to risk under state law both as part of the application process and, had such process succeeded, in Florida Sub's operations.

29.    Despite the efforts of Cosgrove and others, the original applications were not successful due to the problematic nature of the licensing and approval process.

30.    For approximately the next eight months, Cosgrove scoured Florida attempting to locate a partner for Columbia Care that either had a necessary license or was in the process of obtaining one. Columbia Care encouraged Cosgrove to continue looking for a license holder in Florida that Columbia Care could partner with or acquire.

31.    Cosgrove would not have worked to locate a partner for Columbia Care in Florida if not for the promise of compensation for successfully locating a partner for Columbia Care. Cosgrove understood that he would be actively involved as both an owner and manager of any Florida entity which Columbia Care ultimately partnered with or acquired.

32.    During this time, the owner of the company that had won the Central Florida license offered Cosgrove the role of CFO along with an equity stake in that business. Rather than accepting this offer, Cosgrove, at Columbia Care's request, tried to negotiate the acquisition of

the licensee by Columbia Care. Cosgrove would not have foregone the opportunity to own equity in the licensee's business without the understanding that he would have an ownership stake in Columbia Care's Florida business.

33.     Following protracted litigation by third parties with the State of Florida regarding the issues in the licensing process, additional licenses were issued by the state. One of these licenses was issued to Sun Bulb Farms ("Sun Bulb"), owned by Rod Hollingsworth ("Hollingsworth").

34.     During Sun Bulb's litigation with the State of Florida, Hollingsworth's previous operating and financial partners backed out of the proposed medical marijuana business. Because at that time Florida required cannabis businesses be vertically integrated, Hollingsworth needed to secure additional operating partners.

35.     Similarly, for Columbia Care to operate within the state of Florida, it needed a growing partner with a license to satisfy the vertical integration requirements. Columbia Care continued to direct Cosgrove's efforts, asking that Cosgrove contact certain individuals and companies in pursuit of the elusive license.

36.     A mutual friend connected Cosgrove and Hollingsworth regarding the latter's need for operating partners for a marijuana enterprise in Florida.

37.     From his base of operations in Florida, Cosgrove promptly reached out to Hollingsworth and pitched Columbia Care as an operating partner. Hollingsworth was interested and requested Cosgrove explore the opportunity.

38.     A day after meeting with Hollingsworth to discuss his potential partnering with Columbia Care, Cosgrove met with Vita in New York to present a renewed opportunity for Columbia Care to enter the Florida market. Vita was naturally interested in obtaining one of the

limited number of licenses in Florida and specifically requested that Cosgrove set up a meeting between Vita and Hollingsworth.

39.    Approximately a week later, Cosgrove and Vita met with Hollingsworth to discuss a deal between Sun Bulb and Columbia Care. This meeting occurred in Florida and included a tour of the Sun Bulb facilities. After that meeting, Vita told Cosgrove that if the deal were to go through, Cosgrove would have the same deal he was promised before—i.e., Cosgrove would be a "partner" and take an active operational role in the post-combination business.

40.    Because of the limited number of licenses in Florida, Hollingsworth and Sun Bulb received several competing offers along with Columbia Care's and were vacillating between the various offers.

41.    Hollingsworth contacted Cosgrove, both of them located in Florida at the time, regarding the Columbia Care offer and asked whether Columbia Care was financially ready to do the transaction and follow through on its growth plan. Cosgrove confirmed that Columbia Care was ready and willing to move forward.

42.    Hollingsworth and Cosgrove spoke again in Florida shortly thereafter and Hollingsworth asked Cosgrove if he thought Columbia Care was comprised of "good guys" that he would recommend working with. Cosgrove again affirmed his belief in the Columbia Care team and urged Hollingsworth to partner with them, going into some detail about why Columbia Care would be a good business partner for Sun Bulb and Hollingsworth. Hollingsworth also understood that he would be working with Cosgrove as part of Columbia Care in the post-combination business.

43.    Based on Cosgrove's positive comments, and the understanding of Cosgrove's continued future involvement, Hollingsworth accepted Columbia Care's offer to partner with Sun Bulb to enter the Florida market.

44.    When Cosgrove relayed Hollingsworth's intent to move forward with the transaction to Vita, Vita reiterated that Cosgrove would be compensated for his assistance in substantially the same manner contemplated in the original licensing process—i.e., Cosgrove would be a "partner" and take an active operational role in the post-combination business.

45.    Vita also told Hollingsworth that "Columbia Care would take care of Mark."

46.    Around this time, Cosgrove was diagnosed with cancer and went through extensive and temporarily debilitating treatment.

47.    While Cosgrove went through treatment, the deal between Columbia Care and Sun Bulb that Cosgrove facilitated proceeded. Throughout the process, and while undergoing cancer treatment, Cosgrove continued to reassure Hollingsworth that Columbia Care was the right partner even when Hollingsworth raised issues about certain deal terms and considered whether to back out of the transaction with Columbia Care.

48.    The transaction ultimately closed, and Columbia Care began its operations in Florida. However, it did not compensate Cosgrove at this time. It also did not provide Cosgrove with copies of the closing documents or final deal terms. Upon information and belief, Columbia Care instructed Hollingsworth not to disclose any of the details of the transaction to Cosgrove.

49.    The initial transaction was valued at approximately $16 million, consisting of at least $5 million in cash and stock of Columbia Care valued at approximately $11 million. The deal also provided for Columbia Care to invest $25 million in building out operations in the state of Florida post-closing.

50.     The ultimate value of the ongoing salaried management role Cosgrove was to receive, or the equity he was to own in Florida Sub, is difficult to quantify at this time. However, the typical investment banking fee for this type of transaction is 5% of the aggregate transaction value. Accordingly, a reasonable expected value for Cosgrove's work in the Columbia Care Florida transaction would range from $800,000 to $2,000,000 depending on the final valuation. Though the value Cosgrove was denied based on being cut out of Columbia Care's Florida business will likely be illuminated in discovery, even under an alternative estimate of damages his claims exceed this Court's jurisdictional threshold.

51.     After the acquisition, the Florida entity was reorganized and absorbed into Columbia Care as part of Columbia Care's initial public offering.

52.     As part of this reorganization, Cosgrove approached Vita regarding his compensation for the Florida deal, in part because a portion of the original deal for Cosgrove to be a "partner" was to include stock in the entity being reorganized.

53.     In response, Vita told Cosgrove that because of the ongoing initial public offering, Cosgrove would be compensated after Columbia Care went public. Cosgrove accepted this promise and understood that he would be compensated following the initial public offering.

54.     Around that time, a current Columbia Care board member called Cosgrove in Florida specifically asking him to not sue Columbia Care in advance of the IPO. The Columbia Care board member further encouraged Cosgrove that he would be paid for his work after the IPO was completed.

55.     After the IPO, Cosgrove again reached out to Vita from Florida regarding compensation for the Florida transaction.

56.     Vita told Cosgrove that Columbia Care needed to increase its stock price and become closer to profitability before it could compensate Cosgrove for his work.

57.     Again, Cosgrove trusted and relied on the word of Vita and Columbia Care that he would be properly compensated for the work that he performed in bringing the deal between Columbia Care and Sun Bulb to fruition.

58.     Despite continued requests by Cosgrove, Columbia Care did not compensate him for his work in Columbia Care's entry into the Florida cannabis market.

59.     Finally, in November 2019, after years of promises that Cosgrove believed, Vita told him that Columbia Care would not compensate him in any way for his work in the Florida deal. This was the first time that Columbia Care even suggested Cosgrove would not ultimately be compensated for his work facilitating Columbia Care's entry into the Florida market.

60.     Since Columbia Care entered Florida, the market has delivered significant revenue for Columbia Care. Further, because of the limited number of licenses issued by Florida, the license held by Columbia Care to operate in the state carries significant value as an asset of the business that has significantly propped up its stock value.

61.     Without the efforts of Cosgrove, Columbia Care would not be operating in Florida and would not have reaped the financial benefits it has from that state for the past several years, nor would it have a substantial asset as part of its portfolio of operations.

62.     All conditions precedent to this action have occurred, waived, or have otherwise been met.

### Count I: Breach of Oral Contract
*Against Columbia Care*

63.     Plaintiff realleges and incorporates paragraphs 1 through 62 above as if fully set forth herein.

64.     Vita's statements regarding Columbia Care compensating Cosgrove in relation to the Florida transaction constituted an oral contract between Cosgrove and Columbia Care.

65.     Pursuant to this oral contract, Columbia Care was obligated to pay Cosgrove for his services.

66.     Columbia Care breached the oral contract by failing to pay Cosgrove according to the terms thereof.

67.     Cosgrove has suffered damages as a result of the breach.

WHEREFORE, Cosgrove prays this Court enter judgment against Columbia Care for damages to Cosgrove, attorneys' fees, costs, and any further relief this Court deems just and proper.

### Count II: Unjust Enrichment
*Against Columbia Care*

68.     Plaintiff realleges and incorporates paragraphs 1 through 62 above as if fully set forth herein.

69.     Cosgrove pleads this Count in the alternative, to the extent the Court does not determine a contract existed between Cosgrove and Columbia Care.

70.     Cosgrove conveyed a benefit to Columbia Care through his services in brokering the Florida transaction.

71.     Columbia Care was aware of, accepted, and retained this benefit by undertaking the Florida transaction and continuing to operate in Florida.

72.     It would be inequitable for Columbia Care to retain the benefit of Cosgrove's services without paying Cosgrove just compensation.

WHEREFORE, Cosgrove prays this Court enter judgment against Columbia Care for damages to Cosgrove, attorneys' fees, costs, and any further relief this Court deems just and proper.

### Count III: Promissory Estoppel
*Against Columbia Care*

73.     Plaintiff realleges and incorporates paragraphs 1 through 62 above as if fully set forth herein.

74.     Columbia Care made promises to Cosgrove that it would compensate him for his work related to the Florida transaction.

75.     Cosgrove detrimentally relied on these promises in facilitating the Florida transaction, advising Hollingsworth to close the deal with Columbia Care, and foregoing efforts to recover payment from Columbia Care.

76.     Cosgrove's reliance on Columbia Care's promises was reasonable and expected by Columbia Care and Vita.

77.     Enforcing Columbia Care's promises is necessary to avoid injustice to Cosgrove.

WHEREFORE, Cosgrove prays this Court enter judgment against Columbia Care for damages to Cosgrove, attorneys' fees, costs, and any further relief this Court deems just and proper.

### Count IV: Fraudulent Misrepresentation
*Against Columbia Care*

78.     Plaintiff realleges and incorporates paragraphs 1 through 62 above as if fully set forth herein.

79.     Columbia Care made statements to Cosgrove that it would compensate him for his work related to the Florida transaction.

80.    When Columbia Care made these statements, it knew it did not intend to compensate Cosgrove.

81.    Alternatively, Columbia Care made these statements without regard to their truth or falsity.

82.    Columbia Care made these statements to Cosgrove with the intent that Cosgrove would aid in and facilitate the Florida transaction.

83.    Cosgrove relied on these statements in facilitating the Florida transaction and advising Hollingsworth to close the deal with Columbia Care as opposed to other interested buyers.

84.    Cosgrove's reliance on Columbia Care's promises was reasonable.

85.    Cosgrove has been injured by his reliance on Columbia Care's misrepresentations.

WHEREFORE, Cosgrove prays this Court enter judgment against Columbia Care for damages to Cosgrove, attorneys' fees, costs, and any further relief this Court deems just and proper.

### Count V: Negligent Misrepresentation
*Against Columbia Care*

86.    Plaintiff realleges and incorporates paragraphs 1 through 62 above as if fully set forth herein.

87.    Columbia Care made statements to Cosgrove that it would compensate him for his work related to the Florida transaction.

88.    When Columbia Care made these statements, it should have known it did not intend to compensate Cosgrove.

89.    Alternatively, Columbia Care made these statements without regard to their truth or falsity.

90.     Columbia Care made these statements to Cosgrove with the intent that Cosgrove would aid in and facilitate the Florida transaction.

91.     Cosgrove relied on these statements in facilitating the Florida transaction and advising Hollingsworth to close the deal with Columbia Care as opposed to other interested buyers.

92.     Cosgrove's reliance on Columbia Care's promises was reasonable.

93.     Cosgrove has been injured by his reliance on Columbia Care's misrepresentations.

WHEREFORE, Cosgrove prays this Court enter judgment against Columbia Care for damages to Cosgrove, attorneys' fees, costs, and any further relief this Court deems just and proper.

### Columbia LLC Factual Allegations

94.     The allegations set forth in Paragraphs 94 through the end of this Complaint are made in the alternative to the allegations set forth in Paragraphs 1, 2, and 8 through 73.

95.     In 2014, the state of Florida passed the Compassionate Use Act, which began Florida's legal medical marijuana program. At the time, Florida announced that five licenses would be issued across the state for integrated cannabis operators. Because of the limited number of licenses, each license was extremely valuable, and the application process was exceedingly competitive.

96.     Cosgrove, at Columbia LLC's request, facilitated connections between Columbia LLC and local Florida nursery owners (who were essential to the application process) and assisted Columbia LLC in pursuing regional licenses in Central Florida and South Florida through those nursery owners.

97.     As part of this process, Columbia LLC represented to Cosgrove that he would be a "partner" in a newly-created subsidiary of Columbia LLC in Florida ("Florida Sub"). At the time, Nick Vita ("Vita"), Columbia LLC's founder and CEO, described Cosgrove as "head of our Florida operation."

98.     Florida Sub was to be a Florida limited liability company. The term sheets exchanged among the parties regarding Florida Sub's formation, though not ultimately executed, were to be governed by Florida law.

99.     Cosgrove was a substantial participant in preparing the medical marijuana license applications for Florida Sub in 2014, targeting licenses to be issued in the Central Florida and South Florida regions. Cosgrove retained and paid for Florida legal counsel to advise on the requirements of these applications.

100.    Cosgrove drafted sections of the applications and worked with Columbia LLC's in-house counsel in the preparation of the applications' contents.

101.    Cosgrove solicited, evaluated, and retained various personnel for Florida Sub, including a medical advisor (a required role for the applications), as well as growers and other professionals.

102.    In memoranda prepared in 2014, Cosgrove was repeatedly described as part of the "core management group" for Florida Sub.

103.    Other memoranda and term sheets between the parties identify Cosgrove as a "strategic partner" in the creation of Florida Sub.

104.    As a strategic partner, Cosgrove was to receive an equity ownership interest in Florida Sub, and therefore an ongoing interest in the profits thereof after Columbia LLC's acquisition of a license.

105.    As a strategic partner, Cosgrove was also to receive a board seat with management rights where he would participate in the control and operations of Florida Sub after the acquisition of a license.

106.    Though not an exhaustive list, the parties' discussions provided Cosgrove would "provide local expertise, government relations capabilities, and governance participation" with respect to Florida Sub during and after it acquired a medical marijuana license.

107.    To facilitate this, Cosgrove was to be appointed and employed by Florida Sub as the Vice Chairman of the Board.

108.    Cosgrove carried out these duties even before Columbia LLC formally gave him a managerial role. For example, Cosgrove retained top Florida state government lobbyists to assist Florida Sub with zoning for dispensary locations.

109.    Cosgrove also personally went out to evaluate dispensary locations and attempt to secure leases for these spaces for Florida Sub in both Central and South Florida.

110.    Florida law required that all owners and managers of a medical marijuana operation in the state were required to pass a Level 2 background screening.

111.    Because Cosgrove was to be an owner and manager of Florida Sub, he was fingerprinted, submitted details of his professional history, and otherwise underwent the background check process.

112.    In 2014, because of the relative novelty of state-legalized medical marijuana, Cosgrove's involvement therein carried substantial risk. Some of Cosgrove's friends and professional colleagues even questioned why he would take this risk.

113.    The most obvious of these risks was that Cosgrove was agreeing to undertake activities with his co-venturers that violated federal laws concerning cannabis.

114.    Cosgrove's involvement with Columbia LLC predated later changes to banking regulations, and thus Cosgrove risked being de-banked for his involvement in the marijuana industry. Cosgrove actually had two of his personal credit cards terminated by CitiBank as a result of getting into the cannabis business with Columbia Care.

115.    By being listed as a manager and owner on the applications, Cosgrove became responsible for all the statements and contents thereof. Cosgrove took on the risk of participating in a very highly regulated business, subjecting him to risk under state law both as part of the application process and, had such process succeeded, in Florida Sub's operations.

116.    Despite the efforts of Cosgrove and others, the original applications were not successful due to the problematic nature of the licensing and approval process.

117.    For approximately the next eight months, Cosgrove scoured Florida attempting to locate a partner for Columbia LLC that either had a necessary license or was in the process of obtaining one. Columbia LLC encouraged Cosgrove to continue looking for a license holder in Florida that Columbia LLC could partner with or acquire.

118.    Cosgrove would not have worked to locate a partner for Columbia LLC in Florida if not for the promise of compensation for successfully locating a partner for Columbia LLC. Cosgrove understood that he would be actively involved as both an owner and manager of any Florida entity which Columbia LLC ultimately partnered with or acquired.

119.    During this time, the owner of the company that had won the Central Florida license offered Cosgrove the role of CFO along with an equity stake in that business. Rather than accepting this offer, Cosgrove, at Columbia LLC's request, tried to negotiate the acquisition of the licensee by Columbia LLC. Cosgrove would not have foregone the opportunity to own equity

in the licensee's business without the understanding that he would have an ownership stake in Columbia LLC's Florida business.

120.    Following protracted litigation by third parties with the State of Florida regarding the issues in the licensing process, additional licenses were issued by the state. One of these licenses was issued to Sun Bulb Farms ("Sun Bulb"), owned by Rod Hollingsworth ("Hollingsworth").

121.    During Sun Bulb's litigation with the State of Florida, Hollingsworth's previous operating and financial partners backed out of the proposed medical marijuana business. Because at that time Florida required cannabis businesses be vertically integrated, Hollingsworth needed to secure additional operating partners.

122.    Similarly, for Columbia LLC to operate within the state of Florida, it needed a growing partner with a license to satisfy the vertical integration requirements. Columbia LLC continued to direct Cosgrove's efforts, asking that Cosgrove contact certain individuals and companies in the continued pursuit of an elusive license.

123.    A mutual friend connected Cosgrove and Hollingsworth regarding the latter's need for operating partners for a marijuana enterprise in Florida.

124.    From his base of operations in Florida, Cosgrove promptly reached out to Hollingsworth and pitched Columbia LLC as an operating partner. Hollingsworth was interested and requested Cosgrove explore the opportunity.

125.    A day after meeting with Hollingsworth to discuss his potential partnering with Columbia LLC, Cosgrove met with Vita in New York to present a renewed opportunity for Columbia LLC to enter the Florida market. Vita was naturally interested in obtaining one of the

limited number of licenses in Florida and specifically requested that Cosgrove set up a meeting between Vita and Hollingsworth.

126.    Approximately a week later, Cosgrove and Vita met with Hollingsworth to discuss a deal between Sun Bulb and Columbia LLC. This meeting occurred in Florida and included a tour of the Sun Bulb facilities and after the meeting Vita told Cosgrove that if the deal with Sun Bulb were to go through, Cosgrove would have the same deal he was promised before—i.e., Cosgrove would be a "partner" and take an active operational role in the post-combination business.

127.    Because of the limited number of licenses in Florida, Hollingsworth and Sun Bulb received several competing offers along with Columbia LLC's and were vacillating between the various offers.

128.    Hollingsworth contacted Cosgrove, both of them located in Florida, regarding the Columbia LLC offer and asked whether Columbia LLC was financially ready to do the transaction and follow through on its growth plan. Cosgrove confirmed that Columbia LLC was ready and willing to move forward.

129.    Hollingsworth and Cosgrove spoke again in Florida shortly thereafter and Hollingsworth asked Cosgrove if he thought Columbia LLC was comprised of "good guys" that Cosgrove would recommend working with. Cosgrove again affirmed his belief in the Columbia LLC team and urged Hollingsworth to partner with them, going into some detail about why Columbia LLC would be a good business partner for Sun Bulb and Hollingsworth. Hollingsworth also understood that he would be working with Cosgrove as part of Columbia Care in the post-combination business.

130.    Based on Cosgrove's positive comments, and the understanding of Cosgrove's continued future involvement, Hollingsworth accepted Columbia LLC's offer to partner with Sun Bulb to enter the Florida market.

131.    When Cosgrove relayed Hollingsworth's into to move forward with the transaction to Vita, Vita reiterated that Cosgrove would be compensated for his assistance in substantially the same manner contemplated in the original licensing process—i.e., Cosgrove would be a "partner" and take an active operational role in the post-combination business.

132.    Vita also told Hollingsworth that "Columbia LLC would take care of Mark."

133.    Around this time, Cosgrove was diagnosed with cancer and went through extensive and temporarily debilitating treatment.

134.    While Cosgrove went through treatment, the deal between Columbia LLC and Sun Bulb that Cosgrove facilitated proceeded. Throughout the process, and while undergoing cancer treatment, Cosgrove continued to reassure Hollingsworth that Columbia LLC was the right partner even when Hollingsworth raised issues about certain deal terms and considered whether to back out of the transaction with Columbia LLC.

135.    The transaction ultimately closed, and Columbia LLC began its operations in Florida. However, it did not compensate Cosgrove at this time. It also did not provide Cosgrove with copies of the closing documents or final deal terms. Upon information and belief, Columbia Care instructed Hollingsworth not to disclose any of the details of the transaction to Cosgrove.

136.    The initial transaction was valued at approximately $16 million, consisting of at least $5 million in cash and stock valued at approximately $11 million. The deal also provided for Columbia LLC, either directly or through its parent company, Columbia Care to invest $25 million in building out operations in the state of Florida post-closing.

137.    The ultimate value of the ongoing salaried management role Cosgrove was to receive, or the equity he was to own in Florida Sub, is difficult to quantify at this time. However, the typical investment banking fee for this type of transaction is 5% of the aggregate transaction value. Accordingly, a reasonable expected value for Cosgrove's work in the Columbia LLC Florida transaction would range from $800,000 to $2,000,000 depending on the final valuation. Though the value Cosgrove was denied based on being cut out of Columbia LLC's Florida business will likely be illuminated in discovery, even under an alternative estimate of damages his claims exceed this Court's jurisdictional threshold.

138.    After the acquisition, the Florida entity was reorganized and absorbed into Columbia LLC as part of Columbia Care's initial public offering.

139.    As part of this reorganization, Cosgrove approached Vita regarding his compensation for the Florida deal, in party because a portion of the original deal for Cosgrove to be a "partner" was to include stock in the entity being reorganized.

140.    In response, Vita told Cosgrove that because of the ongoing initial public offering, Cosgrove would be compensated after Columbia Care went public. Cosgrove accepted this promise and understood that he would be compensated following the initial public offering.

141.    Around that time, a current Columbia Care board member called Cosgrove in Florida specifically asking him to not sue Columbia Care, or its subsidiary Columbia LLC, in advance of the IPO. The Columbia Care board member further encouraged Cosgrove that he would be paid for his work after the IPO was completed.

142.    After the IPO, Cosgrove again reached out to Vita from Florida regarding compensation for the Florida transaction.

143.    Vita told Cosgrove that Columbia Care needed to increase its stock price and become closer to profitability before it could compensate Cosgrove for his work.

144.    Again, Cosgrove trusted and relied on the word of Vita, Columbia Care, and Columbia LLC that he would be properly compensated for the work that he performed in bringing the deal between Columbia LLC and Sun Bulb to fruition.

145.    Despite continued requests by Cosgrove, Columbia LLC did not compensate him for his work in Columbia LLC's entry into the Florida cannabis market.

146.    Finally, in November 2019, after years of promises that Cosgrove believed, Vita told Cosgrove that Columbia LLC would not compensate him in any way for his work in the Florida deal. This was the first time that Columbia LLC even suggested that Cosgrove would not ultimately be compensated for his work facilitating Columbia Care's entry into the Florida market.

147.    Since Columbia LLC entered Florida, the market has delivered significant revenue for Columbia LLC. Further, because of the limited number of licenses issued by Florida, the license held by Columbia LLC to operate in the state carries significant value as an asset of the business that has significantly propped up its parent company's stock value.

148.    Without the efforts of Cosgrove, Columbia LLC would not be operating in Florida and would not have reaped the financial benefits it has from that state for the past several years, nor would it have a substantial asset as part of its portfolio of operations.

149.    All conditions precedent to this action have occurred, waived, or have otherwise been met.

## Count VI: Breach of Oral Contract
*Against Columbia LLC*

150.    Plaintiff realleges and incorporates paragraphs 3 through 7 and 94 through 149 above as if fully set forth herein.

151.    Vita's statements regarding Columbia LLC compensating Cosgrove in relation to the Florida transaction constituted an oral contract between Cosgrove and Columbia LLC.

152.    Pursuant to this oral contract, Columbia LLC was obligated to pay Cosgrove for his services.

153.    Columbia LLC breached the oral contract by failing to pay Cosgrove according to the terms thereof.

154.    Cosgrove has suffered damages as a result of the breach.

WHEREFORE, Cosgrove prays this Court enter judgment against Columbia LLC for damages to Cosgrove, attorneys' fees, costs, and any further relief this Court deems just and proper.

## Count VII: Unjust Enrichment
*Against Columbia LLC*

155.    Plaintiff realleges and incorporates paragraphs 3 through 7 and 94 through 149 above as if fully set forth herein.

156.    Cosgrove pleads this Count in the alternative to Count VI, to the extent the Court does not determine a contract existed between Cosgrove and Columbia LLC.

157.    Cosgrove conveyed a benefit to Columbia LLC through his services in brokering the Florida transaction.

158.    Columbia LLC was aware of, accepted, and retained this benefit by undertaking the Florida transaction and continuing to operate in Florida.

159.    It would be inequitable for Columbia LLC to retain the benefit of Cosgrove's services without paying Cosgrove just compensation.

WHEREFORE, Cosgrove prays this Court enter judgment against Columbia LLC for damages to Cosgrove, attorneys' fees, costs, and any further relief this Court deems just and proper.

## Count VIII: Promissory Estoppel
*Against Columbia LLC*

160.    Plaintiff realleges and incorporates paragraphs 3 through 7 and 94 through 149 above as if fully set forth herein.

161.    Columbia LLC made promises to Cosgrove that it would compensate him for his work related to the Florida transaction.

162.    Cosgrove detrimentally relied on these promises in facilitating the Florida transaction, advising Hollingsworth to close the deal with Columbia LLC, and foregoing efforts to recover payment from Columbia LLC.

163.    Cosgrove's reliance on Columbia LLC's promises was reasonable and expected by Columbia LLC and Vita.

164.    Enforcing Columbia LLC's promises is necessary to avoid injustice to Cosgrove.

WHEREFORE, Cosgrove prays this Court enter judgment against Columbia LLC for damages to Cosgrove, attorneys' fees, costs, and any further relief this Court deems just and proper.

### Count IX: Fraudulent Misrepresentation
*Against Columbia LLC*

165.    Plaintiff realleges and incorporates paragraphs 3 through 7 and 94 through 149 above as if fully set forth herein.

166.    Columbia LLC made statements to Cosgrove that it would compensate him for his work related to the Florida transaction.

167.    When Columbia LLC made these statements, it knew it did not intend to compensate Cosgrove.

168.    Alternatively, Columbia LLC made these statements without regard to their truth or falsity.

169.    Columbia LLC made these statements to Cosgrove with the intent that Cosgrove would aid in and facilitate the Florida transaction.

170.    Cosgrove relied on these statements in facilitating the Florida transaction and advising Hollingsworth to close the deal with Columbia LLC as opposed to other interested buyers.

171.    Cosgrove's reliance on Columbia LLC's promises was reasonable.

172.    Cosgrove has been injured by his reliance on Columbia LLC's misrepresentations.

WHEREFORE, Cosgrove prays this Court enter judgment against Columbia LLC for damages to Cosgrove, attorneys' fees, costs, and any further relief this Court deems just and proper.

### Count X: Negligent Misrepresentation
*Against Columbia LLC*

173.    Plaintiff realleges and incorporates paragraphs 3 through 7 and 94 through 149 above as if fully set forth herein.

174.    Columbia LLC made statements to Cosgrove that it would compensate him for his work related to the Florida transaction.

175.    When Columbia LLC made these statements, it should have known it did not intend to compensate Cosgrove.

176.    Alternatively, Columbia LLC made these statements without regard to their truth or falsity.

177.    Columbia LLC made these statements to Cosgrove with the intent that Cosgrove would aid in and facilitate the Florida transaction.

178.    Cosgrove relied on these statements in facilitating the Florida transaction and advising Hollingsworth to close the deal with Columbia LLC as opposed to other interested buyers.

179.    Cosgrove's reliance on Columbia LLC's promises was reasonable.

180.    Cosgrove has been injured by his reliance on Columbia LLC's misrepresentations.

WHEREFORE, Cosgrove prays this Court enter judgment against Columbia LLC for damages to Cosgrove, attorneys' fees, costs, and any further relief this Court deems just and proper.

## <u>CONCLUSION</u>

Columbia Care, either directly or by way of its wholly-owned subsidiary Columbia LLC promised Cosgrove that he would be rewarded for his efforts to bring Columbia Care and Columbia LLC into the state of Florida—a transaction in which Cosgrove was repeatedly represented as a key "partner" and in which he would have taken an ongoing ownership and managerial role in the Florida business. Cosgrove achieved this goal, and Columbia Care and Columbia LLC have benefited to the tune of millions of dollars from his efforts. But Columbia Care and Columbia LLC have dishonored their promises to Cosgrove and denied him fair value

for his work. Equity and conscience compel this Court to make Columbia Care and Columbia LLC fulfil their promises and compensate Cosgrove.

WHEREFORE, Cosgrove prays this Court enter judgment against Columbia Care or Columbia LLC on all counts for damages in excess of $800,000 to Cosgrove, attorneys' fees, costs, and any further relief this Court deems just and proper.

Respectfully submitted October 18, 2024.

**David A. Meek, Esq.**
Admitted Pro Hac Vice
**Losey PLLC**
44 Court Street, Suite 1217,
Brooklyn, NY 11201
(407) 491-4842
dmeek@losey.law
docketing@losey.law
*Attorney for Plaintiff Mark Cosgrove*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 18, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will provide electronic service to all parties of record.

**David A. Meek, Esq.**
Admitted Pro Hac Vice

27